UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| HAROLD BERNARD SCHAFFER, #114739, ) ) ) *Plaintiff*, ) ) v. ) ) DERRICK SCHOFIELD, Comm'r of ) Corr.; DAVID SEXTON, Warden; ) SHERRY FREEMAN, Former Health ) Admin'r; GEORGIA CROWELL, ) Health Admin'r; DAVID MOORE, ) M.D.; and CORIZON HEALTH CARE, ) ) All in their Individual and Official ) Capacities, ) ) *Defendants*. ) | No.: 2:13-cv-323-RLJ |

## MEMORANDUM AND ORDER

Offering claims for declaratory, injunctive, and monetary relief, Harold Bernard Schaffer, a state prisoner who is now confined in the Northeast Correctional Complex ("NECX"), in Mountain City, Tennessee, brings this *pro se* civil rights complaint under 42 U.S.C. § 1983 against Derrick Schofield, David Sexton, Sherry Freeman, Georgia Crowell, David Moore, and Corizon Health Care. Defendants, respectively, are the Commissioner of the Tennessee Department of Correction ("TDOC"), the Warden at NECX, a former Health Administrator at NECX, a current Health Administrator at

NECX, a physician at NECX, and NECX's corporate health care provider. All defendants are sued both individually for damages and officially for injunctive relief.

## I.     Screening & Review Standards

Under the Prison Litigation Reform Act (PLRA), district courts must screen prisoner complaints and sua sponte dismiss those that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See, e.g., Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999).

> Responding to a perceived deluge of frivolous lawsuits, and, in particular, frivolous prisoner suits, Congress directed the federal courts to review or "screen" certain complaints sua sponte and to dismiss those that failed to state a claim upon which relief could be granted, that sought monetary relief from a defendant immune from such relief, or that were frivolous or malicious.

*Id.* at 1015-16 (6th Cir. 1999) (citing 28 U.S.C. §§ 1915(e)(2) and 1915A).

In order to state a claim under 42 U.S.C. § 1983, plaintiff must establish that he was deprived of a federal right by a person acting under color of state law. *Black v. Barberton Citizens Hospital*, 134 F.3d 1265, 1267 (6th Cir. 1998); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992). *See also Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990) ("Section 1983 does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere.").

2

The Court must now review the complaint to determine whether it states a claim entitling plaintiff to relief or is frivolous or malicious or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2) and § 1915A. If so, this suit must be dismissed. In performing this task, the Court bears in mind the rule that *pro se* pleadings filed in civil rights cases must be liberally construed and held to a less stringent standard than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

Still, the complaint must be sufficient "to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which simply means that the factual content pled by a plaintiff must permit a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The standard articulated in *Twombly* and *Iqbal* "governs dismissals for failure state a claim under [§§ 1915A(b)(1) and 1915(e)(2)(B)(ii)] because the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010).

The Court has examined the claims offered in the complaint under these guidelines and has determined that, for the reasons stated below, process shall not issue and this action will be **DISMISSED**.

## II. Discussion

### A. Claims Based on Respondeat Superior

Plaintiff has sued defendants Schofield and Sexton for damages in their individual capacities, basing his theory of liability on their positions of authority within TDOC, on

3

the roles they played as overall supervisors of health care at the NECX, or on their failures to institute policies regarding speedier access to health care and inmate safety during inclement weather or when interior prison floors are wet.[1] Thus, plaintiff is seeking to impose liability on these defendants because he believes that they are responsible for supervising or properly managing each TDOC facility, including the NECX; for the provision of proper health care to inmates in TDOC custody; or for the enactment of safety rules to protect inmates in TDOC's custody who are housed at the NECX.

However, plaintiff's theory of liability does not pass muster because § 1983 liability must be based on more than respondeat superior, or a defendant's right to control employees. *Iqbal*, 556 U.S. at 676 ("[O]ur precedents establish . . . that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (finding that liability under § 1983 may not be imposed simply because a defendant "employs a tortfeasor"); *Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 80-81 (6th Cir. 1995).

---

[1] For example, plaintiff's claims against defendant Schofield are that this defendant had a duty to ensure plaintiff's safety and to ensure that plaintiff received proper attention for his serious medical needs, but that, instead, defendant Schofield entered into a contract with Corizon and, thereby, shifted his personal responsibility for NECX inmates' medical care to a corporation, which then failed to provide plaintiff with adequate medical care. Plaintiff also faults defendant Schofield for failing to institute a system whereby plaintiff could have received an immediate X-ray at the local community hospital, rather than having to wait for an X-ray from an X-ray contractor. Plaintiff also faults defendant Schofield for the 19-day delay in plaintiff's consultation with an orthopedic specialist. Defendant Sexton, plaintiff maintains, likewise failed to enact policies to ensure plaintiff's safe passage over icy sidewalks and wet floors.

4

While respondeat superior does not provide a valid basis of § 1983 liability, plaintiff can still hold these two defendants liable so long as he can demonstrate that they implicitly authorized, approved, or knowingly acquiesced in the alleged wrongdoing of any of their subordinates. *See Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1244 (6th Cir. 1989); *see also Iqbal*, 556 U.S. at 676 (finding that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (observing that personal liability is established by showing that an individual official "act[ed to] cause[] the deprivation of a constitutional right").

But defendants cannot be held liable for simple negligence, *Frodge v. City of Newport*, 501 F. App'x 519, 532 (6th Cir. 2012), or for only a failure to act. *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002) (stating that "[s]upervisory liability under § 1983 does not attach when it is premised on a mere failure to act; it 'must be based on active unconstitutional behavior.'") (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (finding that knowledge of a prisoner's grievance and a failure to respond or remedy the complaint was insufficient to impose liability on supervisory personnel under § 1983). Indeed, there must be "proof of personal involvement" to hold a supervisory defendant personally liable for constitutional wrongdoing. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir.2008) (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)).

As plaintiff does not allege that defendants Schofield and Sexton committed any actual acts or that they authorized, or were personally involved in any unconstitutional

5

conduct on the part of any subordinate, there is nothing from which to conclude that they condoned any such wrongful behavior. *See e.g., Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995) (noting that "[t]he general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability"); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (finding that "mere linkage in the prison chain of command" is insufficient to support inmate's § 1983 claim for monetary damages); *Choate v. TDOC*, No. CIV.A. 3 09 0441, 2009 WL 1392633, at *4 (M.D. Tenn. May 18, 2009) (finding that the TDOC commissioner and warden had no liability for failing to establish policies instructing TDOC employees as to how to address medical emergencies, absent proof that they personally engaged in conduct which violated the prisoner's rights).

Therefore, the claims against defendants Schofield and Sexton are **DISMISSED**, for plaintiff's failure to state valid § 1983 claims against them.

### B. Medical Mistreatment Claims

#### 1. Plaintiff's Allegations

The substantive claims in the complaint arose from plaintiff's slip-and-fall accidents, which allegedly occurred at the NECX in December, 2012 and March, 2013. Schaffer asserts that, on December 21, 2012, he slipped and fell on an icy sidewalk in front of the prison infirmary, injuring his left ankle, causing him excruciating, unbearable pain. A correctional officer and a registered nurse came to plaintiff's assistance immediately and helped him inside the infirmary, where the nurse completed a report on

6

plaintiff's injury, looked at his ankle, supplied him with an ace bandage, ibuprofen, and crutches, told him to keep his leg elevated, but gave him nothing for pain.[2]

Plaintiff was in continuous pain, and he signed up for emergency medical care on each of the next two days—a Saturday and a Sunday, but those medical requests were denied. On December 24, 2012, plaintiff signed up for medical care and, that same day, he saw defendant Dr. Moore, the prison physician, who ordered an X-ray of his ankle and an injection to treat his pain. Two days later, on December 26, 2012, X-rays were taken of plaintiff's ankle at the local hospital and, though he asked for pain medication, he was told that only the doctor could order pain medications and that he was scheduled to be seen soon by Dr. Moore. The next day, plaintiff filed a grievance on the subject of his continuous ankle pain and, in it, he expressed a belief that his left ankle had been seriously damaged and that he was receiving substandard medical care.

On January 1, 2013, plaintiff again saw Dr. Moore, concerning his ankle injury. During the visit, Dr. Moore looked at plaintiff's left ankle, but could not locate any X-ray results in the infirmary, despite a lengthy search for those results. Dr. Moore asked that the X-ray contractor for NECX send an emergency copy of the results by Facsimile to the prison infirmary. (Unbeknownst to Dr. Moore, the original X-ray report already had been sent to the facility and had been available since December 27, 2012.) Dr. Moore read the

---

[2] Plaintiff's allegations that he was given ibuprofen but that he was given nothing for pain are at odds since prescription ibuprofen and nonprescription (OTC) ibuprofen are both pain relievers. *See* online http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682159.html#brand-name-1 (last visited July 17, 2015).

7

X-ray report and told plaintiff that he had sustained an oblique fracture in his lower left fibula, a bone located just above the ankle.

Dr. Moore stated that he would complete a request for plaintiff to consult with an orthopedic specialist, but that, even though he [Dr. Moore] would request an emergency response by emphasizing the term "broken bone" in the request for the consultation, it would probably be days before Corizon would approve the consultation. Dr. Moore also commented that there was nothing that he could do about the delay, since it was a procedure which had to be followed and endured. Dr. Moore ordered Tylenol 3 to treat plaintiff's pain, completed the request for a consultation, recommended that plaintiff continue to elevate his leg to reduce swelling, and stated that he would see plaintiff in a couple of days.

On January 3, 2013, plaintiff signed up for sick call to speak to NECX Health Administrator Sherry Freeman, intending to urge her to take steps to expedite approval for the consultation. Defendant Freeman resisted plaintiff's entreaty for assistance in obtaining expedited approval and said that there was nothing which could be or would be done, that plaintiff would just have to wait, and that Corizon would make a decision soon as to whether to grant or deny the request. Even though plaintiff told her that he was in continuous, bad pain, defendant Freeman advised plaintiff that he would "just have to suck it up" and that she had been contacted by the Commissioner's office and told to tell plaintiff not to write the office or have his family call TDOC Commissioner Schofield anymore because plaintiff had received all the medical attention he was going to get.

8

On January 4, 2013, plaintiff signed up for sick call, saw a nurse, and asked her for Ibuprofen to tide him over until he could get pain medications. Plaintiff was instructed to check back the next day, and told that an order had been written for his pain medications. On January 6, 2013, plaintiff received the pain medications, as well as an additional quantity of ibuprofen to supplement the Tylenol.

The next day, January 7, 2013, plaintiff was seen by a doctor, who examined his left ankle, observed swelling around the injury, and advised plaintiff to keep his leg elevated.

On January 9, 2013, plaintiff was taken to the Watauga Orthopedic Clinic, where he saw an orthopedic specialist, a Dr. Greg Cowen.[3] Dr. Cowen examined plaintiff, ordered a series of X-rays and, upon receiving the results, told plaintiff that he had incurred a serious oblique fracture of the fibula, just above the ankle. Dr. Cowen also told plaintiff that, since the break was more than two weeks old, it had begun to heal, without the proper attention which the injury called for initially. Dr. Cowen then ordered that plaintiff be given a cast. A nurse molded a cast over his entire left foot, skipping his toes, and extended it up to just below the bend of his knee. Another nurse fitted a protective boot over the cast.

On January 11, 2013, plaintiff signed up for sick call because the protective boot was several inches too small and had caused the cast to begin to open on the bottom at the

---

[3] In the complaint, plaintiff has spelled this physician's last name as both "Coen" and "Cowen," but for consistency's sake, the Court will use the latter spelling throughout this memorandum.

9

heel area. The nurse who saw plaintiff refused to refer him to a doctor for a determination as to whether to replace the cast.

On January 14, 2013, plaintiff signed up for sick call because the tear on the cast was increasing in size. During plaintiff's visit to the infirmary, the protective boot over the cast was replaced with a much larger one.

On January 16, 2013, plaintiff again signed up for sick call and was seen by Dr. Moore. Plaintiff told this defendant physician that he was having substantial pain in his ankle and that Tylenol was ineffective to relieve the pain. Dr. Moore prescribed plaintiff 5 mg of "Loa tab" pain medication but, when plaintiff showed him the bottom of the cast that was broken, he told plaintiff that the cast was applied only seven days earlier. Dr. Moore then declined to submit a request for a consultation as to whether plaintiff needed a replacement cast because he had concluded that a request would be futile. Dr. Moore so concluded based on his belief that Corizon would deny the request, regardless of whether the cast had broken because plaintiff had been furnished with a protective boot that was too small.

Plaintiff maintains that he spent the month of February of 2013 in continuous pain because the "Lo tab" prescription was not extended by Dr. Moore. However, on February 13, 2013, plaintiff was taken back to the Watauga Orthopedic Clinic for a follow-up examination. After the cast was removed, Dr. Cowen examined plaintiff's left ankle, ordered new X-rays of the ankle, reviewed the ensuing X-ray report, and told him to wear an ankle support brace and an ace bandage for next few weeks because the bone

10

still showed stress but that he was not going to put plaintiff back in a cast. Plaintiff then was fitted with ankle support brace and was escorted back to NECX.

Plaintiff was not seen by an NECX doctor for a "post-examination" and remained in continuous pain "without any further assistance other than the assistance he previously had for pain management," (Doc. 1, Compl. p. 10).

On March 1, 2013, as plaintiff was rushing out of his housing unit, he fell on a wet floor, which was being mopped by an inmate commercial cleaner, who had failed to erect a "wet floor" warning sign, (*Id.*, pp. 10-11). Unfortunately, plaintiff landed directly on his previously-injured left ankle, which caused him severe pain. An officer who saw the accident called for assistance and ten minutes later, an RN examined plaintiff's leg and, along with another correctional officer, helped lift plaintiff off the floor and into a wheelchair, and rolled him into the infirmary and then into triage. Here plaintiff's ankle was reexamined and he was given an ice pack for his ankle and two ibuprofen and told that Dr. Katherine Goff would be consulted with respect to his injury.

Dr. Goff examined plaintiff and directed that he be taken to the local hospital for an X-ray. This was done, and a digital copy of the X-ray was given to the escorting officer who took it back to the prison infirmary. Dr. Goff saw plaintiff, read the X-ray to him and told him that his latest accident had refractured his fibula at the original breaking point but had caused only minimal displacement. Dr. Goff said that she was not going to send plaintiff to the orthopedic clinic but, instead, that she was recommending that he continue wearing the ankle support brace and an ace bandage and that he exercise extreme care to avoid further injury. Dr. Goff also advised plaintiff that his ankle would

11

never be the same, that he would likely have long term pain and discomfort from his injury, and that, possibly, he might develop arthritis, which could be troubling to him on days of inclement weather.

On March 28, 2013, Dr. Goff checked plaintiff during a chronic care visit and inquired about his ankle. Plaintiff explained that he was in great pain and that the 600 mg of ibuprofen he was taking was not proving him any pain relief. Dr. Goff told him that his medication had been recently reordered, that the ibuprofen would have to do at present, and that he should continue to wear his support brace.

On April 25, 2014, plaintiff reviewed Georgia Crowell's "supervisor response" to a grievance he had filed concerning the medical care he was receiving, but her response was off-point and did not address issues he had raised in his grievance. The response showed deliberate indifference to providing plaintiff immediate and appropriate medical care for his broken bone and also disclosed confidential medical information related to a diagnosis he had received three (3) years before his accidents. An addendum to his grievance, the grievance itself, and the response were read aloud at his grievance board hearing on April 10, 2013 and thus, further broadcast plaintiff's confidential medical diagnoses and prior treatment in violation of his constitutional and statutory rights to privacy.

### 2. Law and Analysis

It is well-settled law that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). An Eighth Amendment

12

claim is composed of two parts: an objective component, which requires a plaintiff to show a "sufficiently serious" deprivation, and a subjective component, which requires him to show a sufficiently culpable state of mind—one of deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 and 842 (1994).

Where a prisoner alleges that he has been denied medical care, the objective factor is satisfied by a condition which amounts to a serious medical need. *Id.* at 834; *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official acts with deliberate indifference when he is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and when he actually draws that inference. *See Farmer*, 511 U.S. at 837.

An inmate "who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering." *See Berryman v. Rieger,* 150 F.3d 561, 566 (6th Cir. 1998) (citing *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir.1991)); *see also Estelle*, 429 U.S. at 103 ("[T]he denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."). However, where a prisoner receives some medical care and the dispute is over its adequacy, no claim has been stated. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

By the same token, a difference of opinion between medical care providers as to appropriate treatment for an inmate's medical condition does not present a constitutional controversy. *Estelle*, 429 U.S. at 105-06; *see also Keeper v. King*, 130 F.3d 1309, 1314

13

(8th Cir.1997) (finding that a disagreement between prison physician and physician who originally prescribed medications is not of constitutional magnitude).

The Court sees no constitutional claim here. By plaintiff's own allegations, he received a great deal of medical attention and consistent treatment for his ankle injury and reinjury. Indeed, plaintiff admits he received ongoing care from several nurses and physicians, as well as an orthopedic specialist; that four sets of X-rays of his ankle were ordered and performed; that a cast was placed on his foot; and that he was given injections for pain, oral pain medications, an ankle support brace, an ace bandage, and two protective boots for his cast.

To the extent that plaintiff believes that more or different treatment should have been afforded him for his fractured fibula, he fails to state a claim of constitutional proportions. At most, his allegations sound in medical malpractice, but medical negligence in a prison health care setting is not a constitutional tort to be pursued under § 1983. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation simply because the victim is a prisoner").

The gist of plaintiff's claim of deliberate indifference rests on his allegations that defendants refused "to address plaintiffs [sic] injury immediately with an X-Ray", which he suggest "could have easily been conducted at the local community hospital," and that they "withh[e]ld[] the expedient care of an orthopedic physician as a result of having to wait for approval of such care from the private contracted medical provider Corizon forcing the plaintiff to wait . . . 19 days for appropriate care while suffering continuous extreme pain while only being administered an ace bandage and a walking cane," (Doc.

14

13, Compl., p. 13). Plaintiff's allegations miss the mark because they do not take into account the ongoing and continuous medical care he was receiving from the date of his first injury. *See, e.g., Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (inference of deliberate indifference unwarranted where physician orders treatment consistent with the symptoms presented and then continues to monitor patient's condition unless the need for additional treatment is obvious).

For example, following plaintiff's initial accident, which occurred at 3:00 P.M. on Friday, December 21, 2012, he received immediate medical attention by a nurse. On Monday, December 24, 2012, plaintiff saw defendant Dr. Moore, a prison physician, who examined him, treated him with medications, and ordered an X-ray of his ankle. On December 26, 2012, the X-ray was performed. On January 1, 2012, defendant Dr. Moore read the X-ray, diagnosed plaintiff as having an oblique fracture in his lower left fibula, gave him additional medication, and filled out a request for plaintiff to consult a specialist. On January 9, 2013,—eight days after Dr. Moore requested approval for the consultation with the specialist—plaintiff was taken to see the orthopedic surgeon, whose diagnosis was the same as the prison physician's.

First of all, the "delays" to which plaintiff now objects encompassed several holiday periods. More important, the Court sees no evidence that any delays in the provision of medical care were detrimental to plaintiff or that the alleged delays involved a state of mind of deliberate indifference of the part of any named defendant. *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001). Absent evidence of a

15

detrimental affect or deliberate indifference, plaintiff has failed to establish an *Estelle*-based violation of the Eighth Amendment for delay of medical care.

By the same token, plaintiff's attack on the prison's medical care delivery system, involving the time and place for X-rays to be taken and the necessity to obtain prior approval for referrals to specialists, is not an issue for the Court's consideration, under the circumstances alleged here. As the Supreme Court has recognized, a court cannot intervene "simply on the ground that prison medical facilities are inadequate;" otherwise, it would usurp the state's role of managing its prisons in line with constitutional dictates and would "become the function of the courts to assure adequate medical care in prisons." *Lewis v. Casey*, 518 U.S. 343, 350 (1996) (citing *Estelle*, 429 U.S. at 103); *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) (observing that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial").

Simply put, the Court cannot alleviate TDOC's claimed systemic problems involving the procedure by which X-rays are to be ordered or through which prior approval for referrals to specialists must be obtained. *Estelle*, 429 U.S. at 105-06. So long as the treatment actually afforded plaintiff passes constitutional muster, which it does in this case, he has no § 1983 claim.

The same is true of plaintiff's complaints regarding his pain medications. A disagreement between plaintiff and the medical care providers to how much and what type of pain medication, if any, to furnish plaintiff are not properly raised under the

Eighth Amendment, since those decisions typically are left to a medical professional's judgment. *Estelle*, 429 U.S. at 105-06,

Likewise, no relief is warranted for plaintiff's claim that, in responding to his grievance, defendant Crowell disclosed his confidential medical information concerning a prior condition. This is so because the challenged conduct does not implicate plaintiff's constitutional rights. The Sixth Circuit has held that an individual does not possess a constitutionally-protected right to keep his medical records confidential. *J.P. v. DeSanti*, 653 F.32d 1080, 1087-91 (6th Cir. 1981); *Doe v. Wigginton*, 21 F.3d 733, 740 (6th Cir. 1994). Plaintiff fails to state a claim for deprivation of his right to privacy with regard to this defendant's divulging of his medical information.

Plaintiff's assertion that the same conduct on the part of defendant Crowell also violated his rights under HIPPA (Health Insurance Portability and Accountability Act of 1996) suffers from a similar fatal infirmity. In general, HIPPA governs confidentiality of medical records and regulates how "covered entities" can use or disclose "individually identifiable health (medical) information (in whatever form) concerning an individual." 45 C.F.R. §§ 160 and 164. However, HIPPA regulations do not confer a private right of action on an individual. Plaintiff's only redress for an alleged HIPPA violation is to lodge a written complaint with the Secretary of Health and Human Services, through the Office for Civil Rights, who has the discretion to investigate the complaint and impose sanctions, both civil and criminal. *See* 45 C.F.R. § 160.306. For these reasons, plaintiff fails to state a claim against defendant Crowell for the alleged infringement of his HIPPA privacy rights.

17

The last alleged instance of wrongdoing on the part of defendant Crowell was her failure to address the true subject matter of the grievance and her decision to include irrelevant and confidential medical information in her response—an action which caused prejudice to plaintiff, (Doc. 1, Compl, p. 15).

"All circuits to consider this issue have . . . found that there is no constitutionally protected due process right to unfettered access to prison grievance procedures." *Walker v. Michigan Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005) (listing cases). "Accordingly, since a violation of a constitutional right is required in order to obtain relief under § 1983," *id.*, and since plaintiff has no right to a grievance system in the first place, his allegations regarding the content of the supervisor' response to his grievance fails to state a claim for relief.

In short, none of the allegations concerning plaintiff's medical treatment state a claim which would entitle him to relief under § 1983.

### C. Claims Based on Negligence

Plaintiff faults defendants Schofield and Sexton for failing to enact policies requiring that NECX walkways be de-iced during inclement weather and that cautionary signs be placed on wet interior floors. Plaintiff surmises that, had these suggested policies been promulgated and enforced at the time of his accidents, those policies would have prevented injuries such as those he has suffered from falling on the icy sidewalk and wet floor. Plaintiff asks that the Court enter an injunction, ordering defendant Schofield to issue an immediate directive, addressing these two potentially dangerous conditions

18

and requiring that measures be instituted to make icy walkways and wet floors safe for inmates to cross.

The claims that plaintiff's ankle injury and reinjury were caused by defendant's failure to the redress dangerous icy walkways and wet floors at NECX sound in negligence. It is well recognized that allegations of mere negligence will not entitle a plaintiff to relief under 42 U.S.C. § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Arnett v. Webster*, 658 F.3d 742, 758 (7th Cir. 2011) (finding that "the Eighth Amendment doesn't codify common law torts") (citation omitted). Accordingly, since such matters do not state a constitutional claim and since they lie within the bailiwick of Tennessee legislators and executive officials, and not within this Court's jurisdiction, plaintiff has failed to state a constitutionally cognizable claim for injunctive relief. *Bell*, 441 U.S. at 548.

### III. Conclusion

Based on the above discussion, the Court finds that plaintiff's contentions fail to state viable § 1983 claims against defendants. Therefore, this case will be dismissed *sua sponte* in its entirely, under 28 U.S.C. § 1915(e)(2)(B)(ii) and § 1915A.

Finally, the Court has carefully reviewed this case pursuant to 28 U.S.C. § 1915(a)(3) and hereby **CERTIFIES** that any appeal from this action would not be taken in good faith. Therefore, if plaintiff files a notice of appeal from this decision, he must also submit the full appellate filing fee of $505.00 or, alternatively, a motion to proceed *in forma pauperis*, a financial affidavit, and a certified copy of his inmate trust account statement for the six months prior to the filing of the notice.

All pending motions are **DENIED** as **MOOT**.

A separate judgment order shall enter.

**SO ORDERED.**


**ENTER:**

*/s/ Leon Jordan*
LEON JORDAN
UNITED STATES DISTRICT JUDGE